## Frances P. Hansel, Appellee, v. First National Bank of Mansfield, Appellant.

1. BANKS AND BANKING—*extent of authority of cashier.* A cashier has authority to bind his bank, and entries made by him, even though relating to forged paper, charge such bank with notice of transactions being conducted by him on behalf of the bank.

2. TROVER—*when lies to recover for conversion of forged securities.* Trover lies to recover the face value of forged securities upon which the defendant has repeatedly paid interest, such defendant being thereby estopped to deny the existence of such securities.

Trover. Appeal from the Circuit Court of Piatt county; the Hon. W. G. COCHRAN, Judge, presiding. Heard in this court at the May term, 1909. Affirmed. Opinion filed October 18, 1910. *Certiorari* denied by Supreme Court (making opinion final).

C. F. MANSFIELD, for appellant; REED & REED and F. M. SHONKWILER, of counsel.

HERRICK & HERRICK, for appellee.

PER CURIAM. During a period of several years prior to January 16, 1902, when the defendant, First National Bank of Mansfield, received its charter and commenced to do business, James C. Langley was successively the cashier of the Commercial Bank of Mansfield and the State Bank of Mansfield. Upon the organization of the defendant bank Langley became its

128        APPELLATE COURTS OF ILLINOIS.

Hansel v. First National Bank of Mansfield, 158 Ill. App. 127.

cashier and continued in that capacity until the fall of 1906, when he was found to be a defaulter to said bank in about the sum of $68,000. During his connection with said banks, Langley, by reason of his intimate acquaintance with the plaintiff, Frances P. Hansel, a former resident of Mansfield, acted as her agent in making loans, collecting the principal and interest thereon, paying taxes on certain real estate and transacting such of her financial affairs as were conducted at Mansfield. Shortly after the defalcation by Langley, as cashier of the defendant bank, became known, the plaintiff brought her action in trover against said bank to recover the value of certain notes payable to her order, which notes were alleged to have been wrongfully converted by said bank to its own use. The several notes involved are designated in the record, as follows: The Scott note for $1,000 bearing date April 26, 1895; two Garber notes for $700 each bearing date December 27, 1900; two Campbell notes, one for $650 bearing date March 27, 1901, and one for $400 dated May 6, 1900; the Swartz note bearing date July 2, 1900, for $150; the Wright note bearing date May 20, 1901, for $125; seven Stauffer notes, one for $310.05, five for $100 each and one for $150, all bearing date April 15, 1896; and the Clemens note bearing date August 18, 1899, for $400. The cause was tried by the court, without a jury, and resulted in a finding and judgment against the defendant for $5,139.94, from which judgment the defendant prosecutes this appeal.

The amount of the judgment is predicated upon the finding of the court incorporated in the record, as follows:

"HANSEL VS. BANK.

Interest computed at the rate of 5% on principal of notes.

| Note | Principal | Interest | Due 6-22-08 |
|---|---|---|---|
| H. B. Scott, et al | $1,000.00 | $213.86 | $1,213.86 |
| John Garber, et al | 1,400.00 | 299.43 | 1,699.43 |

Hansel v. First National Bank of Mansfield, 158 Ill. App. 127.

| | | | |
|---|---|---|---|
| Thos. Campbell, et al... | 650.00 | 136.66 | 786.66 |
| Thos. Campbell, et al. $400.00 | | | |
| Paid .... 222.00 | | | |
| Balance ... | 178.00 | 36.46 | 214.46 |
| Elizabeth Wright, et al. 125.00 25.00 | | | |
| Bal. ....... | 100.00 | 37.73 | 137.73 |
| Menno Stauffer 650.00 400.00 | | | |
| Bal. ....... | 250.00 | 121.92 | 371.92 |
| J. J. Swartz.......... | 150.00 | 59.50 | 209.50 |
| Wm. Clemens, et al. 400.00 50.00 | | | |
| Bal. ....... | 354.05 | 152.33 | 506.38 |
| | $4,082.05 | $1,057.89 | $5,139.94" |

Prior to the organization of the defendant bank and occasionally thereafter, the correspondence with Langley relative to the business in hand was conducted by the plaintiff, who during the greater part of that time resided in New York, and in almost every instance the envelopes containing the correspondence by plaintiff were addressed to "Mr. J. C. Langley," who was referred to in the letters as "Dear Jim." The only letter appearing in the record written by Langley to the plaintiff, bears date May 25, 1905, is signed "J. C. Langley," and addresses the plaintiff as "Dear Mrs. Hansel." Commencing April 27, 1902, the correspondence relative to the business of the plaintiff was conducted with Langley on her behalf, by her husband, Charles Hansel, acting as her agent, and in almost every instance the correspondence by Hansel was directed to Langley as cashier, or vice-president of the defendant bank, and the correspondence

by Langley was signed by him as cashier. On the date last named, Langley, in response to a request by Hansel for a statement of the plaintiff's account, in his capacity as cashier of the defendant bank, wrote a letter to Hansel wherein he stated in part, as follows:

"I enclose herewith as complete a statement of account of Mrs. Hansel as we are able to make from our records; we commence this account under date of April 13, 1899, at which time Mrs. Hansel was either here or in Springfield and the account covers everything to date. I wrote to her in January relative to investing $1000.00 in Bank stock in the new First National Bank, certificate for which stock is herein enclosed, if for any reason Mrs. Hansel does not want the stock, if you will return it we will promptly remit you $1000.00 plus 7% interest since its date. I enclose herein a list of all notes on hand and also wish to acknowledge receipt of note of Manley & Barnhart, $200. and interest. Instructions to collect all notes noted and will collect and remit as fast as paid. If Mrs. Hansel would like to sell some of her paper would be glad to buy them, renewing them for shorter periods on our own forms."

The statement of account referred to in the letter was entitled "First National Bank in account with Frances P. Hansel," and purported to set forth in detail numerous items of debit and credit commencing March 13, 1899, and concluding April 24, 1902. The items of credit included a draft for $1,300 which was enclosed in the letter and also a balance of $46.56 as due to the plaintiff. Accompanying the letter was a receipt for the Scott note of $1,000, noting payment of interest thereon to April 26, 1900, and five Stauffer notes of $100 each, noting payment of interest thereon to April 15, 1901, together with several other notes not involved in this proceeding. This receipt bears date April 27, 1902, and is signed "First National Bank of Mansfield, James C. Langley, Cashier."

On May 23, 1902, Hansel wrote to Langley in his capacity as cashier of defendant bank relative to sev-

eral over-due notes payable to the plaintiff which notes he stated the plaintiff desired Langley to collect, and further stated as follows:

"I also would be pleased to have an offer from you for the other outstanding paper which you are looking after as Mrs. Hansel desires to have all the funds in bonds so as to avoid any possibility of loss. Will you kindly advise how soon you can make the collections of the above over due notes and oblige."

In reply to this letter, Langley, signing himself as cashier, wrote to Hansel on June 7, 1902, in part as follows:

"Your letter received and in reply will say that we will buy Mrs. Hansel's paper as fast as we can get into shape, i. e., renewed upon our own forms so it will pass the National Bank Examiner; if you will kindly send me the" (here are designated several notes not involved in this suit) "I will get these into shape at once as they all live close to us and will notify others. I think they may as well send J. W. Bateman who lives in Iowa also—note $250, as it is small. We have a rule on our minute book to buy no paper out of our territory but I have some investors here who want some paper like this and can use beyond doubt—regarding the stocks, can give you $1,250 for the State Bank stock and $1,000 plus 5% from date for the First National Bank of Mansfield stock—these I can use now and remit at once, the other paper soon as can get into shape, but if you will have Mrs. Hansel endorse the other paper to me, or to the Bank or better yet, have her endorse it in blank, just write her name on back of each note, I can, if necessary remit for them as promtly and get them into shape as soon thereafter as we can. On second thought it would not do for me to carry past due paper at the bank nor would it do for me to in any way exceed the ten per cent limit of the National Banking law so I am doubtful if I could promptly use the notes but if you send them I will remit and have some of our people carry them until I can renew them to the bank if makers desire renewals."

On July 1, 1902, Langley, signing himself as cashier, wrote to Hansel reporting the collection of several of the notes mentioned in their prior correspondence and therewith enclosed a statement with draft for $2,507.18, being the amount of principal and interest collected on said notes.

On August 5, 1903, Langley, signing himself as cashier, wrote to Hansel in part, as follows:

"Regarding the loaning of additional funds would say, that we believe we could loan a few thousand and if agreeable with you would think it much better to make loans either in sums of $5000 even or $1000 even, without partial payment privileges. Partial payment privileges make it rather difficult to keep loans upon a profitable basis.

"In this connection would suggest that from a standpoint of business and compensation to our mutual interests as bankers and as stockholders that we make loans upon a basis of from ½ to 1% commission to ourselves depending upon the rate obtained. In this case we could guarantee all loans made upon personal security but are by law prohibited from endorsing loans made upon real estate security. Of course we would attend to collection of interest and principal without cost and we can get usually 6% and in some cases 6½ or perhaps 7%.

"It seems that in sums of $500 and $1000 or even thousands it would be easier to keep records, etc., and when you reply you may advise us whether to remit for balance now on hand or leave at your credit and loan from the account. The balance now is a little over $500.

"We loan a good deal of money at 30, 60 and 90 days over the bank counter to customers but we rarely make loans for the bank for a longer period. Good applications for loans for 6 months and one year are often made and if we can agree on rates, think can favor you with some nice paper.

"You may expect the statement of interest collection within a day or so."

On the same day, Langley, as cashier, wrote to Hansel in part as follows:

"We hold a note and mortgage of Thomas Campbell face of same being $650. When this paper was sent to us it was understood by us that Mr. Campbell wished to pay it off—he says, however, that there is another note and mortgage, of another amount and that it was the one he desired to pay at present so you may send it to us and if paid we can arrange for release for the mortgage later on."

On August 8, 1903, Langley, in his capacity as cashier, wrote to Hansel enclosing a statement of the account of plaintiff showing a balance due plaintiff of $505.31 on that date. This account included certain credits to plaintiff upon notes here involved as follows:

"Thomas Campbell on principal of $400.00 note $100.00; interest on said note for one year $28.00; Menno Stauffer on account $400.00; John Garner interest one year on $700.00, $42.00; John Garner interest on $700.00, one year $42.00; H. B. Scott interest on $1000.00, $60.00; T. Campbell on $400.00 note $122.00."

Under date of September 5, 1903, Langley, signing himself cashier, wrote to Hansel in part, as follows:

"We find we have the following notes on hand to-wit:

| | | | |
|---|---|---|---|
| H. B. & Olive M. Scott. | $1,000. | with 6% int. from April 26th, 1903. |
| John Garber and wife | 700. | with 6% int. from March 1st, 1903. |
| Same | 700. | with 6% int. from March 1st, 1903. |
| Thos. Campbell | 650. | with 7% int. from Mar. 17th, 1902. |
| W. H. McKee and wife · | 275. | with 7% int. from Dec. 11th, 1900. |

$3,325."

And under date of December 4, 1903, Langley, writing in the same capacity, enclosed a statement to Hansel, as follows:

"List of notes on hand Dec. 4, 1903.

| | | |
|---|---|---|
| Thomas Campbell | $ 650.00 | & Int. |
| Thomas Campbell | 400.00 | & Int. less credits $222.00 |
| Garber, John et al. | 700.00 | & Int. |
| Garber, John | 700.00 | & Int. |
| W. S. & Angeline Hitchens | 400.00 | & Int. less credits. |
| Eliz. Wright et al. | 125.00 | & Int. less $25 credits |
| H. B. Scott et al. | 1,000.00 | & Int. |
| Menno Stauffer | 150.00 | & Int. |
| Menno Stauffer | 100.00 | & Int. |

$4,325.00

NOTE:—The exact amount due from Menno Stauffer on Sept. 5th, 1903, was $310.05 as per letter of that date."

On August 22, 1904, Hansel wrote to Langley as follows:

"J. C. LANGLEY, CASHIER,
    FIRST NATIONAL BANK,
        MANSFIELD, ILL.

DEAR SIR:—

On July 28th I directed a letter to you, carbon of which I enclose because I have just discovered that it was sent to Mansfield, Ohio.

I have not heard from you for some time and would be pleased to have you give me a prompt answer to mine of July 28th."

The carbon copy of the letter there referred to is, as follows:

"July 28, 1904.

J. C. LANGLEY, CASHIER,
    FIRST NATIONAL BANK,
        MANSFIELD, OHIO.

DEAR SIR:—On April 20th, I sent you the note of J. J. Swartz, dated July 2, 1900, for $150 due April 15, 1904, with interest at 6%, and asked you to collect same if Mr. Swartz desired to pay it. I have not heard from you since and would be pleased to see either a draft on New York for $150 with interest to this date, or else receive a renewal of the note, and would appreciate your kind attention.

The note of Emma Killion for $300, interest to May first. Kindly send me check for this interest.

No interest has been paid on the note of Thomas

Campbell for $650 since March 29, 1903. I will be pleased to hear from you concerning this note.

The note of H. B. Scott for $1000. No interest has been paid on this since March 1, 1903.

Two notes of John Garber each for $700. No interest paid since March 1, 1903.

Will you kindly send me a statement of the status of the notes in your hands and cash in bank, and very much oblige.''

In the course of subsequent correspondence with Hansel, Langley reported additional payments of interest on the Scott, Garber and Campbell notes, and as to the Clemens and Swartz notes the record discloses that Langley requested the same to be sent to him for collection, and that they were so sent by Hansel.

Undoubtedly the fact that a friendly, personal and family relation existing between the plaintiff and Langley was responsible in part in the first instance for the selection of Langley by the plaintiff as her business agent but it is fairly inferable from the record that that relation was also induced in part by the fact that Langley was the cashier of the Commercial Bank in which the plaintiff carried her account and that the plaintiff transferred her account to the State Bank and subsequently to the defendant bank by reason of the fact that Langley was successively the cashier of said banks. The record discloses that the several notes belonging to the plaintiff and not retained by her were kept in the defendant bank for collection, for the account of the plaintiff; that said notes were entered for collection on the books of the defendant bank and that when payments of principal and interest were made upon said notes such payments were made at said bank and received by it in the usual course of business and entered upon the books of the bank to the credit of the plaintiff. The correspondence relative to the notes in controversy was in the main carried on between Langley, in his capacity as cashier

of the defendant bank, and Charles Hansel, as the agent of the plaintiff, and was of such character as to reasonably induce a belief in the mind of Charles Hansel, acting as the agent of the plaintiff, that he was dealing with the defendant bank through its accredited agent, Langley, in his official capacity as cashier.

The transactions here involved were within the ordinary scope of the business of the defendant bank and the entry of such transactions upon its books constituted notice to it of the extent and character of such transactions, if any such notice was necessary, in view of the fact that Langley was the cashier and general business manager of the bank. The fact that some of the entries in plaintiff's account with the defendant bank were false and fictitious and contained items relating to forged paper cannot relieve the defendant bank from liability, because it is bound by the acts of its cashier in that respect. In Ryan v. Dunlap, 17 Ill. 40, it was said: ''The cashier is necessarily the general agent of the bank in dealing with customers in money, notes and bills—the receipt, deposit, transfer and payment of them. It is indispensable to the interests of the corporation, and necessary to the protection and security of the customers that he should exercise these powers, and that his acts should bind his employers.''

We find that the trial court was fully warranted in finding that the transactions relating to the notes here involved were conducted by Langley for the plaintiff, in his official capacity as cashier of the defendant bank, and that the latter is liable to the plaintiff therefor.

It is urged that the court improperly refused to permit the defendant to show in what manner and by whom the business of the plaintiff in the loaning and collection of her money was transacted during the time that Langley was cashier of the State Bank of Mansfield and while the plaintiff carried her account in that bank. Defendant did not offer to prove any particular state of facts by the witnesses called by it

and the record does not disclose with any particularity the evidence which is claimed to have been excluded. While in the first instance the general inquiry might with propriety have been permitted as tending to show the character of Langley's agency at the time in question the error in sustaining the objection to such inquiry did not operate to the prejudice of the defendant because the full scope of such inquiry was covered by the subsequently admitted statement of the witnesses that during the time in question Langley looked after the loaning and collecting of plaintiff's money.

It is insisted on behalf of defendant that this action in trover will not lie for the alleged conversion of the two so-called Garber notes for $700 each, because, it is claimed that said notes had no existence in fact. The record discloses some confusion with reference to the description of these notes, as they appear to have been designated in the correspondence as the "Garber" notes, the "Garner" notes and the "Gardiner" notes. We are inclined to think that this apparent discrepancy in the designation of the notes is due merely to clerical errors or to the obscurity which frequently prevails in writing proper names. There can be no doubt under the evidence that $1,400 of the money of plaintiff was claimed to have been invested by Langley in two notes for $700 each purporting to be signed by John and Terecia Garber. As heretofore stated the defendant bank, by Langley its cashier, repeatedly represented to plaintiff that it had said notes in its possession, and also remitted to the plaintiff interest which it claimed to have collected on said notes, and it is therefore estopped from denying the existence of said notes, and that it had possession of the same.

The transaction relating to the Scott note here involved is somewhat complicated and a statement of the same would unduly extend this opinion. The rea-

sons which operate to estop defendant from denying its liability on the Garber notes are also applicable to the Scott note.

The note of Elizabeth Wright for $125, the principal of which had been reduced to $100, when the note came into the possession of defendant bank, was thereafter fully paid to the defendant in installments, which payments appear not to have been remitted to the plaintiff.

It is claimed by defendant that several payments made upon some of the notes in controversy were applied by it in liquidation of two notes alleged to have been given by the plaintiff to the defendant, one note which on June 27, 1902, amounted to $2,507.22 principal and interest, and one note for $2,000 bearing date January 8, 1903, but the evidence justifies the conclusion that no such notes were given by the plaintiff to the defendant, and that they were improperly charged to her in what is designated by defendant as the correct statement of account of Frances P. Hansel.

The Campbell note for $650 was listed by defendant as being in its possession on December 4, 1903, and on September 10, 1904, and June 20, 1905, reports were made to the plaintiff of the collection of the annual accrued interest on said note. While the principal of the note appears to have been paid by the maker to the bank, the latter has not given the plaintiff credit therefor. Upon the Campbell note for $400, payments amounting to $222 upon the principal were accounted for to the plaintiff, but the balance of the principal amounting to $178, although received by the bank has not been accounted for to the plaintiff. The finding of the court as to the amounts due upon the Stauffer, Clemens and Swartz notes is based upon the same proof as to the possession of said notes by the defendant and the collection by it in whole or in part of the principal and interest due thereon, which it failed to account for to the plaintiff.

Numerous propositions of law and questions of fact were submitted to the trial court, and errors are assigned by the defendant upon the action of the court in holding certain propositions submitted by the plaintiff as being the law applicable to the case and in refusing certain propositions of law and questions of fact submitted on behalf of defendant. Some of the propositions of law submitted on behalf of plaintiff and marked ''held'' by the court are not wholly accurate and some of the questions of fact submitted on behalf of defendant and marked ''held'' by the court are inconsistent with the general finding, but in view of the application of the doctrine of estoppel as heretofore indicated in this opinion no finding as to the liability of the defendant, other than that arrived at by the trial court, could have been properly entered in the case and the judgment of the court on such finding must be affirmed.

*Affirmed.*